Good morning, ladies and gentlemen. Our first case for this morning will be Reeder v. Madigan. Mr. Hubert. May it please the Court, my name is Jacob Hubert and I represent the appellants Scott Reeder and the Illinois Policy Institute. This case is about whether the defendants can ever be sued to deny a journalist media credentials that would give him access to the press boxes of the Illinois House and Senate. The defendants claim that they can never be sued for denying someone media credentials. They claim absolute legislative immunity protects those decisions from judicial review even when they're alleged, as they are here, to violate the First and Fourteenth Amendment rights of the journalist. I want to ask you something. Can a lobbyist sue the Speaker of the House for denying her access to the floor? It depends on the circumstances under which that happened. If the lobbyist applied for media credentials or some other kind of pass and was denied that outside of the legislative proceedings, then yes, the lobbyist could sue the Speaker of the House or whoever the decision maker was for that, because the decision on whether to grant a credential or a pass that grants access to the floor of the legislature is not itself a legislative act. So is it your view then that if one of the people in the courtroom today decided that they wanted to go to the floor of the Illinois legislature, they would have an unmitigated right to do that? They don't have an unmitigated right to go to the floor of the legislature. It is a question of whether a particular act directed toward keeping them off the floor of the legislature is legislative in character. If the Speaker of the House were standing on the floor of the House, presiding over the House while it was in session, and he gave an order that directed someone else to remove a person from the floor of the legislature, then that order would likely be considered a legislative act because it was done in the legislative proceedings. It was speech by the Speaker on the House floor that was integral to those proceedings. Why isn't presence on the floor of the legislature automatically legislative? I'm not sure how far you want to take this, whether you think the media ought to be in our chambers as we're talking about cases with law clerks. I don't see why the line isn't rather naturally drawn at the floor of the legislature. Well, the concerns you're raising pertain to the merits of the First Amendment claims. It may well be that a First Amendment claim saying that someone had access to get into a judge's chambers or something like that would be frivolous and would be dismissed out of hand. But that doesn't get to whether the act of granting someone a credential that, in turn, gives them access to press boxes is itself a legislative act. But why isn't regulating who gets press passes integral to the process of legislating? I mean, isn't integrity essential to legislating? And doesn't this regulation prevent lobbyists from being able to get into a press box, basically threatening the integrity of the process? It could serve that purpose, but that doesn't answer the question of whether the decision on credentialing is itself a legislative act. But you seem to think there are no transaction costs involved. And if you look at the speech or debate laws and if you look at its analog for state legislatures, the whole point is to keep people in the legislature and to keep the legislature out of the litigation arena defending these kinds of decisions when you're talking about the integrity of the legislative process. Respectfully, Your Honor, the purpose is not to prevent legislators from ever having to deal with litigation related to their official duties. I didn't say that, though. I said on the floor of the legislature, if you're off in Carbondale giving a speech or debating a speech, then maybe the press needs to be there. But you're not on the floor of the legislature in Springfield. But the action we're looking to here is the credentialing decision. And the credentialing decision doesn't occur on the floor of the legislature. Right. But if I could interrupt for just a second, Mr. Hubert, I thought I heard you say a moment ago that if the decision were made on the spot by the speaker while presiding, that would be entitled to legislative immunity. There would certainly be a better argument for legislative immunity in that case. Consider it a slam dunk. But why should the answer be any different simply because the decision is made ahead of time rather than spur of the moment? And there's something on the floor and giving a direction related to the actual immediate conduct of those proceedings. A credentialing decision is removed from that process. We don't want the speaker... It affects precisely the same person and place, right? It doesn't affect precisely the same person. The effects are the same, but the action is different. I mean that you could... You could, you know, you could block access to the legislature in a variety of ways that keep people out that clearly wouldn't be legislative activities. If the legislature erected some sort of barrier outside of the chamber, outside of the building that prevented people from crossing a certain line, that might, that might have the effect of keeping people off the floor. They're able to set up their own security measures, right? They are able to set up their own security measures. They do precisely that. You have to go through screening to go in. Let me follow up for a second because you're drawing this distinction between, in essence, promulgation of a rule or enactment of a rule and enforcement of it. And there's some support in the case law for that. I'm not sure how strong its legs are, but there is some support. But if we were to buy into that distinction and say that the individual applications for media credentials are subject to judicial review, as you propose, why couldn't the, or could the speaker simply say, forget promulgation of a general rule. The rule will simply be that access to the floor and media credentials is provided at the discretion of the speaker. They could do that, and if the speaker made all of those decisions right in the context of legislative proceedings, it is possible that those orders of the speaker, the speaker could not be sued for giving those orders. But even then, an official charged with barring a particular journalist from the floor, the house doorkeeper, say, could still be sued for that enforcement action. For simply carrying out the speaker's orders? That's right. Why is that consistent with Gravel? Well, it's consistent with the Supreme Court's decision in Powell. No, but Gravel is later. Powell is kind of a high watermark to deal with an extraordinary circumstance. So, what about Gravel? I mean, Gravel says that an action has to be integral to legislative proceedings, and I'm not quoting, but it says that it has to pertain to the process of the communication and deliberation in the legislature. And surely, who's on the floor has something to do with that process. I could understand your position that it's an administrative function if the speaker were making decisions about credentialing, you know, for example, to protect the quality of the news coming out of the chamber to ensure dissemination of news equally throughout the state or to promote minority involvement in journalism. In those cases, I can see. I think I can see how credentialing decisions are not integral to the legislative process. But this is different. This isn't different from that because it is an administrative decision. It's a decision about whether a particular journalist satisfies the criteria in a rule and whether that particular journalist... You're anticipating the answer to the question, as I'm sure you know, by phrasing it as you do. Because the question is, is a lobbyist a journalist in the meaning of the credentialing rules? And the Illinois legislature has decided that the answer to that question is no, and has equally decided, through a couple of thoughtful letters that we have in the record, that the organization that your client works for is a lobbying organization. And that's relevant to his First Amendment claim. And if the courts consider the merits of the First Amendment claim, no doubt the government will argue that their interest in keeping lobbyists off the floor trumps the plaintiff's First Amendment right to access to the press facilities. Actually, why isn't that a perfectly good argument? Nobody's keeping him out of the galleries. He's got full access to whatever's going on. He can listen. He can blog. He can write columns. He can do whatever he wants. Lobbyists are free to circle the legislators, so to speak, in the hallway of the Capitol, in their offices, on the golf course, in restaurants. But the legislature should still, it seems to me, be able to stop them at the chamber's door, even if we happen to think it's somewhat arbitrary. Again, that goes to the merits. And no doubt they'll argue that they have a compelling interest in doing that, and that their rule is the least restrictive means of accomplishing it. But it's not just the merits. It's about whether the zone of immunity that is represented by the analog to the speech or debate clause covers the decisions about who's on the floor of the legislature. That's where we are. Now, of course, what's happening, we can't really talk about it sensibly without talking about merits, but it's an immunity question. You want every case, us to sit there and to decide, well, are 100 lobbyists enough on the floor, or is maybe 50 enough, or is it 500? The limits to your proposition are very difficult for me to see, actually, as a mere matter of logistics, but that to one side. Why not give the legislature the authority to say, we're drawing a zone here where only qualified journalists are going to get credentials to be in this press area? Which, by the way, I'm going to say, your position is a little bit contradictory, because in your reply brief, you made it sound like people are actually penned in behind huge walls, and it's meaningless to be in the press area, whereas your opening brief painted it as sending little messages around and talking to people and doing all sorts of things. I'm not sure which side of that you're on. Well, both briefs state that the journalist in the press facilities does have the opportunity to send interview requests via pages that they would not otherwise have if they weren't in there, but whether that gives them any opportunity to go lobby in the sense of communicating anything substantive or doing anything that could possibly disrupt or influence a legislator while they're trying to conduct legislative business is another question. The next question. It sounds like it's much ado about nothing in some ways, in which case, why not let the legislature govern who's going to be on the panel, which quite accurately says, use one of the many other opportunities you have to meet with the legislators? Again, we would say that goes to the merits of whether their interest in that outweighs the journalist's First Amendment interest. If he's a journalist. In every case in which the Supreme Court and this court have said that the Supreme Court was protecting was an integral sense of the legislative process in the sense that it was part of the process of how ideas are transformed into bills and then in turn transformed into laws. And are you prepared to say that the debates on a legislative floor, even in today's world, which we recognize may not exactly match the 1787 convention that drafted the Constitution or other ideal situations, but surely that's where people make speeches, bills are introduced, ideas are exchanged, people run over and talk to somebody else at another desk. That is the heart of the legislative process. If that's not protected, then I have no idea what is. There's no question that those things are exactly what is for other members of the legislature. And keeping outsiders out of your hair while you're trying to do that. But to interfere with any of those activities that the Supreme Court and this court have held are protected, the court would have to interfere with the legislative process itself and the possibility of being sued for any of those things could deter a legislator from pursuing a particular substantive course of legislative action. Whereas here, there's no reason why a decision that occurs outside of the proceedings would deter any given legislature from pursuing any substantive course of action, any particular substantive legislative action. Mr. Hubert, we've got the guidelines here that were promulgated look pretty neutral in terms of content and viewpoint, right? We would not agree that they're neutral in terms of their content. Because if you discriminate against a particular type of organization, in this case the rules incorporate the standard for who has to register as a lobbyist that's in an Illinois statute. And that says that if you're a journalist employed by a for-profit corporation that lobbies, you can still be in the press facilities. But if you're a journalist who works for a non-profit organization that lobbies and doesn't primarily engage in the dissemination of news, then you can't be. So your objection is to the rules as promulgated? That's right. We argue that the rules are unconstitutional. If that's true, that would seem to be, according to the rest of your argument, a core legislative function. But there's a difference between reviewing the rules. The court can review the rules in the context of reviewing the action of enforcing them. Just like in the Powell decision. Wait a second. Are you telling me  the text of the rules to decide whether they are constitutional in terms of granting or denying access to the floor? If they affect a private citizen's constitutional rights, yes. Alright, that sounds, I have to say, pretty core as far as legislation goes. It seems like you've gotten away from your distinction between promulgation and enforcement administration. But let me ask if I could whether you think you need to look at motive to pursue these claims? Absolutely not. The First Amendment analysis... Do you foreswear any inquiry into the speaker's or legislative official's motives? That's correct. The First Amendment analysis would look at whether the rule or action is narrowly tailored to serve a compelling governmental interest. And you don't look to motive for that. You just look to whether it serves the interest. Well, if you'd like to save a little rebuttal time... No, are you finished? If you would like to save a little rebuttal time, you may do that. Or if you'd like to use it up now, that's your call. I will save it. Thank you. Alright, thank you. Ms. Shapiro. May it please the Court, counsel? I'm Solicitor General Carolyn Shapiro on behalf of the defendants. This case is about who gets to decide who has access to the floor of the legislature while the legislature is in session. Is it the legislature itself or is it the courts? I know that we don't have to address what you've called a parade of horribles, but is there any way that you can assuage our concerns about the scenarios where the legislature is only granting press passes to the liberal news outlets or only to the conservative outlets or possibly based on race or religion or gender? How would anyone ever challenge the disparate allocation of press credentials when absolute immunity is absolute? The Supreme Court in Kilbourne, the D.C. Circuit in Consumer's Union, and the First Circuit in Harwood all explain that there may be extreme cases where the legislature's actions are so clearly violative of somebody's fundamental constitutional rights that absolute we can imagine those kinds of hypotheticals and the fact that the court does retain the authority to say, okay, not this far, doesn't mean that the court should remove absolute immunity from what is in fact the core of the legislative process. Can I rephrase what you've just said and ask whether you are arguing that there could be times that two different parts of the Constitution have to be reconciled with one another? You still have, I mean at the federal level or the analog for the states, you still have the concept of legislative immunity reflected in speech or debate, but you certainly also have prohibitions in the Constitution against race discrimination or discrimination on the basis of religion, etc. So, am I right to understand that you just think there's sometimes you would need to deal with both of those? I think those times are extremely rare and highly unlikely to arise. It's certainly the case that here plaintiffs are arguing that we have some kind of conflict between different provisions of the Constitution, but there's no question, even plaintiffs don't suggest that it is outside the power of the legislature to decide who actually gets made. How important is it to the analysis here that people in the position of Mr. Reader, lobbyists and others, do have access to the galleries, etc.? Suppose the General Assembly next says, you know what, those pesky lobbyists are really a nuisance, we're not even going to let them walk in the door. They can watch whatever video feed there is from the legislature. Access to the galleries, I think, is also part of the core legislative process. That is in part the lesson of Consumers Union, where the D.C. Circuit said that even though the press gallery in that case was not a box on the floor, but in fact a gallery above the floor, decisions about who had access to it were core legislative functions. You know, according to the amicus brief, 30 states expressly prohibit lobbyists from the chamber's floor. So does the fact that 20 states do not have such rules demonstrate that the rules aren't integral to the legislative process? I think that's a merits question. I think that's a question about whether or not the rule is a good rule or a necessary rule, and that really comes into the question of whether or not, if we got to the merits, there's a strong enough interest to support the rule. That's not a question about whether or not there's immunity. Immunity is simply, is there a sphere, the legislative sphere, in which courts are not supposed to inquire? And the floor of the legislature, who has access to the floor of the legislature while it is in session, is well within that sphere. Do you happen to know how  Would there be any reason, given Powell versus McCormick, to draw a distinction between Speaker Madigan and President of the House Cullerton on the one hand, and Mr. Brown and Ms. Phelan on the other? Not after Gravel. Gravel makes very clear that an aide to a legislator who is exercising the powers of that legislator that have been And even plaintiffs don't argue otherwise in this case. General Shapiro, there's a long line of cases, and we may be litigating them for another generation or so, involving legislative prayer practices. Does immunity apply to those official prayers? The Eighth Circuit addressed that question in prayer occurs entirely before any of the legislative activity takes place, before the actual business of the legislature. One could debate whether the Eighth Circuit is correct about that ruling, but that is the precedent that we have at this point. It's quite another story from asking who has access to the floor while the actual deliberations are going on. So Mr. Reeder could be on the floor during the prayer. Is that what you're saying? No, that's not what I'm saying. What I'm saying is that the Eighth Circuit allowed litigation about the legislative prayer to go forward as not being absolutely immune. And the justification for the lack of immunity was that the prayer took place entirely before the legislative session. Again, I think that is a debatable proposition. We certainly don't need to go there in this case, but it is also quite a different proposition from what we have in front of us here. So if there were some social event taking place in the state capital, a celebration of the 200th anniversary of the state of Illinois or something, when that comes along, these rules might not apply? These rules apply only to access to the floor while the legislature is in session. That's what we are arguing about here. The argument that plaintiffs try to make that these rules are somehow exercising the authority delegated by these rules as administrative and not legislative is really an overly technical use of language in other cases that involve completely different circumstances. Cases where you have entities that engage in both executive and legislative functions. And it's important to try to distinguish between the nature of a particular action. So here's the problem, I think. Maybe this is why this case even came up. Once upon a time, there were a lot of reporters working for quite a few different independent newspapers, and they could get credentials under these rules. And as the press has changed and things have gone online and papers have gone out of business, there are fewer and fewer of this kind of journalist that the rules were probably written for. And instead, people like Mr. Reader wind up working for other kinds of outlets, I'll just call them. Certainly he writes stories, he has newspaper columns, he does things. And it seems that there's sort of an attrition of the number of people who are able to get press credentials just because the media itself has changed. And so that might suggest that maybe the rule needs re-examination. Whether or not the rule should be re-examined is a question for the legislature to decide. And they certainly have the power to revisit the rule. But I'll add that there's nothing in the rule that prevents somebody whose primary outlet is on the internet, for example, from having a press pass if they otherwise meet the criteria in the rule and the Lobbyist Registration Act. So if the how appealing people had asked for press credentials in Illinois, would they have gotten them? Well I don't know quite enough about how their organization is structured, but they very well might be able to get them if they are a not-for-profit, for example, that is primarily engaged in the dissemination of news. Do you think we should assume that having access is always a huge advantage in journalism? Having access to the floor? I don't think that's actually strictly relevant to the question in the case. But as you noted, the access here is not particularly significant. There is a public gallery that Mr. Reeder has complete access to. He has complete access to the committee rooms. All of the proceedings from the legislative floors are streamed on the internet. There are transcripts. He is certainly not unavailable to gather information about what is happening in the state legislature. You may have answered one of the questions I had because of course sometimes the legislature is taking up a topic that's of tremendous public interest and the public galleries must get full when something like that happens. So one of the advantages of having the press credential is that you don't have to worry about whether the seats have been used up or I don't know whether the legislature cycles people out if it's one of those, you know, they're talking about the death penalty or they're talking about whatever the new issues are going to be of tomorrow. But surely one of the reasons that you'd want press credentials is assured presence in the chamber, not just hit or miss. That may be one of the reasons that Mr. Reeder wants press credentials, but even a press credential does not guarantee unfettered access on a day when the legislature is busy. The press boxes are not infinite. They are actually relatively small and on a busy day they may be full. And there may have to be... Do you happen to know how many people they seat? That's not in the record, but they seat at most approximately 18 to 20. So on a busy day the journalists actually have to take turns sitting in the press box. And those who aren't there just look at the stream. Is there a separate room where you can watch it? There is a press room, but I don't honestly know whether there is a facility that arranges for the public to watch the stream. So who does what? How do you get access to the press? I just don't know whether or not there is a screen in the building that anybody can go and watch. Okay, but if you brought your handy iPad with you or something you can get... Absolutely. If there are no further questions, we'd like to emphasize again that questions about access to the floor of the legislature are indeed for the legislature itself and not for the courts. And we ask that this Thank you. There is no conflict between the Gravel decision and the Powell decision. Gravel merely makes clear that if an aide is assisting in the carrying out of a legislative act, then the aide has immunity to the same extent that the legislator would for the same act. So with the hypothetical we had where Speaker Madigan ruled from the floor, yes you can have access, no you can't. The aide would have immunity for that kind of decision. The officer who enforced the order would not have immunity for that decision. Because the officer would be enforcing the legislative action. But it wouldn't be... The legislative act has already occurred once the Speaker has given the order. At that point it is up to the doorkeeper to enforce the order that the Speaker has made. Is it your position that the Sergeant at Arms should say sorry, Madigan? Is that your position? I don't think it would be reasonable to expect him to do that. But the Powell decision... What a strange rule you are arguing for. He has no choice but to enforce the Speaker's order. Yes, and that is absolutely consistent with Powell. In Powell it did not matter that the house doorkeeper was acting according to an order that he had been given by the house. The court explicitly said that it did not matter that he was carrying out an order. Under the presence of this court, it doesn't matter whether he has to follow that order or not. But then of course in Gravel you have the language legislative immunity extends beyond pure speech or debate in either house to actions that are necessary to prevent indirect impairment of such deliberations. Which surely means that the legislative body is entitled to instruct its employees. I'm not sure if I'm happy with the distinction between personal employees of each legislator and employees of the institution. That's not the distinction. The distinction is whether the aides action is itself a legislative act. And barring someone from entering the house under Powell is not a legislative act. It's an enforcement act. And every single action that this court has recognized as protected by legislative immunity has been a step in the legislative process, has been something that a person coming up with a list of how does a bill become a law would put on that list. Deciding which guy should get to be in the press boxes would not be on anyone's list of steps in the legislative process. It's incidental to the process. It's separate. Hansen from this court and Brewster from the U.S. Supreme Court make clear the action must be a part of the legislative process itself. Not merely that it would have good effects related to legislative process, but that it is actually a part of the legislative process itself. Congress had quite a debate about whether it was going to sit in New York for a while or whether it was going to move right down to Philadelphia. Do you think it was having a legislative debate? I'm not sure where exactly they conducted that debate, but a debate is a debate. They finally resolved to stay in New York for a bit and then they went down to Philadelphia and of course ultimately to what became the District of Columbia. In other words, the place of holding the legislature was a very significant decision. Legislators' internal communications among themselves are protected under Doe v. McMillan. There's no question about that. Thank you very much. Thanks to both counsel. We'll take the case under advisement.